NOTICE

Decision filed 08/03/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 200328-U

NO. 5-20-0328

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| MEGAN BUSH, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Shelby County. |
| | ) | |
| v. | ) | No. 20-OP-111 |
| | ) | |
| TIMOTHY PEDIGO, | ) | Honorable |
| | ) | Amanda S. Ade-Harlow, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Cates and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's plenary civil no contact order was not against the manifest weight of the evidence where the evidence established that the respondent engaged in nonconsensual sexual conduct for the petitioner's gratification.

¶ 2    The petitioner, Megan Bush, filed a *pro se* petition pursuant to the Illinois Domestic Violence Act of 1986 (Domestic Violence Act) (750 ILCS 60/101 *et seq.* (West 2020)), requesting the circuit court to enter an emergency order of protection and a plenary order of protection against the respondent, Timothy Pedigo. The circuit court determined that Pedigo did not qualify as a family member as that term is defined in the Domestic Violence Act. Therefore, the circuit court concluded that the Domestic Violence Act did not apply

1

and treated Bush's *pro se* petition as a proceeding under the Civil No Contact Order Act (740 ILCS 22/101 *et seq.* (West 2020)), rather than the Domestic Violence Act. After an evidentiary hearing, the circuit court entered a plenary civil no contact order in favor of Bush and against Pedigo. Pedigo now appeals from the circuit court's civil no contact order. For the following reasons, we affirm.

¶ 3                                     BACKGROUND

¶ 4     Bush and Pedigo knew each other when they were children in the mid- to late-1990s. Bush's grandfather had been Pedigo's stepfather during this time. The record established that Bush and Pedigo, along with Bush's two brothers, spent a lot of time together as children, catching a bus to school from Pedigo's house and playing together after school. Bush and Pedigo parted ways when Bush's grandfather died in 2000, and they did not maintain any relationship afterwards.

¶ 5     Twenty years later, on September 8, 2020, Bush filed a petition pursuant to the Domestic Violence Act seeking emergency and plenary orders of protection against Pedigo. In her petition, Bush described the need for the order of protection as follows: "fild [*sic*] sexual abuse against [Pedigo]. He has been trying to contact me in last 24 hours. Him and his mother over the sexual abuse charges being filed with Shelby County *** for something that happen [*sic*] when I was a child."

¶ 6     On the same day, the circuit court conducted an *ex parte* hearing on Bush's request for an emergency order of protection. Bush testified at the hearing, but the record does not include a transcript of the *ex parte* hearing. In a docket entry, the circuit court noted that Pedigo did not qualify as a family member as defined under the Domestic Violence Act.

2

Therefore, the circuit court stated in its docket entry that it converted Bush's petition into a request for a civil no contact order[1] and entered an emergency civil no contact order against Pedigo instead of an emergency order of protection. The emergency civil no contact order prohibited Pedigo from, among other things, coming within 1000 feet of Bush or entering Bush's place of residence or place of employment. The circuit court scheduled a September 29, 2020, hearing on Bush's request for a plenary civil no contact order.

¶ 7     The parties appeared in court on September 29, 2020, for an evidentiary hearing on Bush's petition. Bush appeared *pro se* and Pedigo was represented by counsel. At the hearing, Bush testified that when she was five years old, she was "molested" by Pedigo at her grandfather's house and that the abuse continued until she was eight or nine years old. The incidents took place between 1995 and 1998. In 1995, Pedigo would have been 11 or 12 years old. Specifically, Bush testified about an incident during this period when she was walking home from a friend's house when she encountered Pedigo and one of his friends and they all ended up at Pedigo's house. Bush testified that Pedigo "proceeded to pull my pants off and examine me. And [Pedigo] was trying to explain to his friend how girls liked to be touched." Bush also described another incident when Pedigo, Bush, and Bush's brothers were playing hide-and-go-seek, and Pedigo forced Bush to hide with him. Bush testified, "He would try to get me to touch him as he was touching me." Bush testified that when she told Pedigo that she did not want to touch him, Pedigo convinced Bush's brother

---

[1]The Domestic Violence Act allows for the issuance of a civil order of protection for persons in a dangerous dating or familial relationship (see 750 ILCS 60/201(a) (West 2020)), and section 213 of the Civil No Contact Order Act provides that civil no contact orders are also available for victims of sexual assault. See 740 ILCS 22/213 (West 2020).

to tie her to a swing set. According to Bush, she was left tied up for 45 minutes and dislocated her shoulder trying to escape from being tied up. Bush also told the circuit court about an incident where she "had refused" and Pedigo told her that he would push her brothers in front of a train if she told anyone. Bush testified that the "abuse didn't stop until after [her] grandpa passed away. We had moved." The grandfather passed away in 2000, and Bush and Pedigo parted ways and did not maintain any relationship. Bush told the circuit court that she never reported the incidents because Pedigo had told her that he would hurt her brothers if she did, although she talked about the incidents with her friends throughout her childhood. According to Bush, she first mentioned the incidents to her mother in 2006 or 2007 when she was a junior in high school.

¶ 8    These past incidents resurfaced in Bush's life in early September 2020 when one of Bush's acquaintances, Brandon Bierman, began asking Bush questions about Pedigo. Brandon was divorcing his wife, Natasha Bierman, who had begun dating Pedigo a few months earlier. According to Bush, Brandon was concerned about the custody of his children and Bush volunteered to prepare a statement about her past incidents with Pedigo for Brandon to use in his custody battle with his ex-wife. Bush prepared the statement, but the record on appeal does not include Bush's statement or a description of its contents. After writing the statement for Brandon, Pedigo began sending Bush messages through the Facebook messenger application. Specifically, Pedigo asked Bush in a Facebook message, "Are you going to put me in jail im [*sic*] not running if so I just need to prepare my 11 yr old son for it is all." In a second message Pedigo wrote, "Plz one way or another answer for his sake plz." Bush testified that she did not reply. After receiving these messages, Bush

4

decided to speak with law enforcement officers and seek an order of protection. According to Pedigo, he sent Bush the messages a few days before Bush filed her petition seeking an order of protection. Bush told the court that she wanted Pedigo to leave her and her family alone, adding "I have lived through enough."

¶ 9 At the hearing on Bush's petition, Bush's brother, Matt Musson, testified about text messages he exchanged with Pedigo over the course of two days in September 2020, around the time Bush filed her petition. Musson explained that he had been friends with Pedigo since they were kids. In a text to Musson, Pedigo wrote that Bush was "pressing charges on me cause of this." Pedigo also wrote, "just being prepared for it need to know if I need to expect the cops at the door is all." Musson responded in a text that he did not know and that no one was talking to him about it. Pedigo then mentioned in a text to Musson that he was afraid of losing his son and that he was going to assume he needs to get ready "to get picked up at some point." Musson also testified that when he and Bush were children, there were "plenty of times" when they were alone with Pedigo with no adults around.

¶ 10 In his defense, Pedigo presented the testimony of his mother, Mary Gordon. As explained above, Gordon was married to Bush's grandfather prior to the grandfather's death in 2000. Gordon testified that she got to know Bush in the 1990s when Bush spent time at Gordon's home while Pedigo lived at the home as well. Gordon told the court that Bush was at her home "all of the time." Bush, Pedigo, Musson, and Bush's other brother caught a school bus from Gordon's home and the children often returned to Gordon's home after school. Gordon also worked with Bush's mom at the same place of employment.

According to Gordon, Bush never mentioned to her that Pedigo had acted inappropriately at any time. In addition, no one else ever told Gordon that something inappropriate might have happened or had been happening between Bush and Pedigo. Gordon did not see any signs that something was happening between them, and she noticed no changes in Bush's behavior during this period. Gordon testified that she first learned of Bush's allegations when Pedigo told her.

¶ 11 Pedigo also presented the testimony of his girlfriend, Natasha Bierman, who was previously married to Brandon. Natasha testified that she learned about Bush's allegations against Pedigo when Brandon sent her a message telling her that Bush was going to go after Pedigo.

¶ 12 Pedigo testified that he had one 11-year-old son who he saw on weekends during the school year. He testified that he started dating Natasha Bierman when she was still going through her divorce from Brandon. According to Pedigo, growing up, his relationship with Bush and her brothers was that of brothers and sisters. Pedigo explained that Bush and her brothers were dropped off at his house to catch a bus for school, and sometimes Bush and her brothers were dropped off at his house after school. According to Pedigo, during this period, his stepfather (Bush's grandfather) was "always present." On cross-examination, Pedigo admitted that "as kids living in the country, of course, we're going to run around in the country and be alone."

¶ 13 Pedigo denied ever inappropriately touching Bush. He testified that, upon learning of Bush's allegations, he reached out to Bush and to Bush's brother, Matt Musson, because he was concerned about how the allegations might impact his relationship with his 11-year-

old son. He was also concerned that the allegations could impact his career and lead to his arrest. Pedigo told the court that the allegations against him were false and that he believed the allegations were merely for Brandon to use against him and Natasha and for Brandon to gain an advantage in his custody battle with Natasha.

¶ 14    At the conclusion of the hearing, the circuit court noted that the case centered on a credibility determination, *i.e.*, whether or not Bush's testimony was credible. The circuit court specifically found Bush's testimony to be credible. The circuit court also found Pedigo's texts to be significant as the texts caused the court "significant concern that these events that [Bush] has testified to did in some way, shape, or form occur." The circuit court granted Bush's request for a plenary no contact order, entering a no contact order that was in effect for a period of two years, until September 22, 2022. Pedigo now appeals from the plenary civil no contact order.

¶ 15                                    ANALYSIS

¶ 16    The purpose of the Civil No Contact Order Act is to provide a civil remedy to protect victims of sexual assault from future interactions with the offender. 740 ILCS 22/102 (West 2020). Under the Act, a petition may be filed "by any person who is a victim of non-consensual sexual conduct or non-consensual sexual penetration, including a single incident of non-consensual sexual conduct or non-consensual sexual penetration." *Id.* § 201(b)(1). The statute defines "non-consensual" as a "lack of freely given agreement." *Id.* § 103. "Sexual conduct" means "any intentional or knowing touching or fondling by the petitioner or the respondent, either directly or through clothing, of the sex organs, anus, or breast of the petitioner or the respondent, *or any part of the body of a child under 13*

7

*years of age*, *** *for the purpose of sexual gratification or arousal of the petitioner or the respondent*." (Emphasis added.) *Id*. The standard of proof in a civil no contact order proceeding is a preponderance of the evidence. *Id.* § 204(a). Section 213(a) of the Civil No Contact Order Act states that "[i]f the court finds that the petitioner has been a victim of non-consensual sexual conduct or non-consensual sexual penetration, a civil no contact order *shall* issue." (Emphasis added.) *Id.* § 213(a).

¶ 17     On appeal, the respondent argues that our review of the circuit court's order is under the *de novo* standard of review. This is incorrect. Under the statute, the sole issue is whether nonconsensual sexual conduct occurred. See *id.* A "single incident" is sufficient to prove the petition. See *id.* § 201(b)(1). The circuit court must consider the evidence and determine whether Bush proved that nonconsensual sexual conduct occurred between her and Pedigo. See *id.* § 204(a). This is a factual inquiry that we will not overturn unless the circuit court's finding is contrary to the manifest weight of the evidence. *J.M. v. Briseno*, 2011 IL App (1st) 091073, ¶ 39; see also *McNally v. Bredemann*, 2015 IL App (1st) 134048, ¶ 12; *Nicholson v. Wilson*, 2013 IL App (3d) 110517, ¶ 22. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 18     Pedigo argues that the circuit court erred in issuing the plenary civil no contact order because Bush "offered absolutely no evidence that the conduct was done for the sexual gratification of [Pedigo] or [Bush] as required under the statute and caselaw." As noted above, in order to be protected under the Civil No Contact Order Act, Bush had the burden

8

of proving that Pedigo committed an act of nonconsensual "sexual conduct" and the statute defines "sexual conduct" as sexual acts committed "for the purpose of sexual gratification or arousal of the petitioner or the respondent." 740 ILCS 22/103, 213(a) (West 2020). Accordingly, we agree with Pedigo that part of Bush's burden of proof was proving by a preponderance of the evidence that Pedigo's acts were committed for purposes of sexual gratification or arousal. We disagree, however, with Pedigo's assertion that Bush failed to present sufficient evidence from which the trier of fact could find that she proved this element of her claim.

¶ 19    As noted by the circuit court, the issues in this case center on Bush's credibility, and the circuit court specifically found Bush to be a credible witness. "A reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Best*, 223 Ill. 2d at 350-51. We give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002).

¶ 20    Bush testified about an incident that occurred when Pedigo was between 11 and 16 years old; Pedigo pulled Bush's pants down and examined her private areas in front of his friend, explaining to his friend "how girls liked to be touched." The circuit court considered this testimony and concluded that it was sufficient evidence to establish that Pedigo committed the specific acts described by Bush for purposes of Bush's sexual gratification. The circuit court explained its ruling as follows:

"The question—and then the question becomes the sexual conduct. You are correct. There must be testimony with regards to some kind of sexual gratification. A failure to provide sexual gratification, or something to suggest that there was a sexual gratification gives the court the power to deny the request for the order of protection.

*** There was that testimony, and I will tell you where it comes from. I do find [Bush's] testimony to be credible. And when she testified as to Mr. Pedigo and his friend and showing his friend 'this is how girls like to be touched' that testimony right there. It is not for the sexual gratification necessarily of the respondent, but it is also for the purpose of the sexual gratification of the petitioner, of the victim. And that is where the statute gets lost sometimes. We all assume that it is always the person that does the act, or is alleged to have done the act. If they are doing it for their own sexual gratification. But the law was written to understand that it is quite possible that the defendant doesn't do it for their [*sic*] own, but that they believe that they are doing it for the victim.

And that, to a certain extent, is where this court is at with the testimony provided, coupled with the concerns or the text messages and the FaceBook messages from Mr. Pedigo to Ms. Bush. For the purposes of this type of hearing, certainly is not made beyond a reasonable doubt, because that is not my job here."

¶ 21 Considering Bush's testimony in light of the statutory language, we cannot reverse the circuit court's finding that Pedigo engaged in sexual conduct for Bush's gratification. Pedigo pulled Bush's pants down and explained to his friend how girls liked to be touched

10

while doing so. This is evidence from which a trier of fact can find that Pedigo touched Bush "for the purpose of sexual gratification or arousal of the petitioner." 740 ILCS 22/103 (West 2020). Pedigo's statement while committing the act at issue provided evidence from which the trier of fact could find that Pedigo's actions were overtly sexual. As a result, the trial court's finding that Pedigo acted with the purpose of sexually gratifying Bush was not against the manifest weight of the evidence, and we have no basis to reverse this factual finding.

¶ 22    In support of his argument that the circuit court erred in entering the plenary civil no contact order, the respondent cites *In re Matthew K.*, 355 Ill. App. 3d 652 (2005), and *In re E.R.E.*, 245 Ill. App. 3d 669 (1993). Both cases involved minors who were adjudged delinquent of aggravated criminal sexual abuse, and similar to the present case, they involved minors accused of touching other minors. These cases are distinguishable.

¶ 23    The adjudications in each case were reversed based on the finding that the State had presented insufficient evidence of the minor's intent. *In re Matthew K.*, 355 Ill. App. 3d at 653; *In re E.R.E.*, 245 Ill. App. 3d at 670. In each case, the appellate court based its reasoning on the proposition that "it is not justified to impute the same intent into a child's action that one could reasonably impute into the actions of an adult." (Internal quotation marks omitted.) *In re Matthew K.*, 355 Ill. App. 3d at 655; *In re E.R.E.*, 245 Ill. App. 3d at 673. The courts held that when a case involves alleged sexual conduct by a minor, the act itself does not stand to show a purpose of sexual gratification. *In re Matthew K.*, 355 Ill. App. 3d at 655; *In re E.R.E.*, 245 Ill. App. 3d at 673. Instead, the State must present

sufficient evidence to show that a minor acted with the intent of sexual gratification. *In re Matthew K.*, 355 Ill. App. 3d at 655.

¶ 24 In the present case, the fact finder did not impute Pedigo's intent merely from his actions alone. Instead, the circuit court considered all the evidence presented at the hearing, including statements Pedigo made at the time of his acts from which the trier of fact could infer that Pedro committed the acts with the required intent, *i.e.*, Pedigo expressly stating that he was showing how girls like to be touched. In addition, the circuit court considered evidence of Pedigo's consciousness of guilt as reflected in his threats to harm Bush's brothers if she reported him. *In re D.H.*, 381 Ill. App. 3d 737, 741 (2008) ("Statements that show a consciousness of guilt can support the inference that the accused intended to gratify his sexual desires."). The circuit court also considered Pedigo's Facebook messages to Bush as corroborating evidence as follows:

> "[Pedigo's statement to Bush in his Facebook message] starts off, 'Are you going to put me in jail?' It is not an innocent statement necessarily *** and coupled with the idea that, 'I am not running. So I just need to prepare my 11-year-old son for it is all.' It causes this court some significant concern that these events that [Bush] has testified to did in some way, shape, or form occur."

¶ 25 Also, we note that in both *In re Matthew K.* and *In re E.R.E.*, the State was obligated to prove intent of sexual gratification with proof beyond a reasonable doubt. *In re Matthew K.*, 355 Ill. App. 3d at 655; *In re E.R.E.*, 245 Ill. App. 3d at 673. In the present case, we offer no opinion on whether the evidence adduced at the hearing would be sufficient to establish that Pedigo committed an act of "sexual conduct" with proof beyond a reasonable

12

doubt. In the present case, in order for Bush to be entitled to a civil no contact order, she was required to prove Pedigo's intent only by a preponderance of the evidence, not beyond a reasonable doubt. As noted above, Bush presented sufficient evidence from which a rational trier of fact could infer the necessary findings for the issuance of a civil no contact order. The record is devoid of any contrary evidence that would support a finding that Pedigo's actions were merely curiosity-satisfying and not intended for either his or Bush's sexual gratification or arousal.

¶ 26    We also note that in *In re Matthew K.*, a child psychiatrist deemed "eminently qualified" by the circuit court opined that the respondent was a socially inept 12-year-old whose motive in touching the victim was unclear. The doctor said his "strong opinion" was that the respondent had no interest in sexual gratification or arousal. *In re Matthew K.*, 355 Ill. App. 3d at 654. In reversing the aggravated criminal sexual abuse, the *In re Matthew K.* court concluded that the intent of sexual gratification could not be inferred from the acts of the "socially deficient" boy. *Id.* at 655. In the present case, unlike the facts in *In re Matthew K.*, there was no testimony from an expert witness who believed that the requisite intent should not be attributed to Pedigo. In addition, as noted above, the circuit court did not infer intent based only on Pedigo's act but also based intent on Pedro's expressly declared intent in performing the act as well as threats he made to keep Bush quiet about his conduct.

¶ 27    We further note that in *In re E.R.E.*, there was no evidence of statements revealing the respondent's intent before, during, or after the alleged touching. Here, as we noted above, Pedigo specifically declared his intent to show his friend how girls like to be

13

touched. Nor was there evidence in *In re E.R.E.* of the respondent acting as if he had done something wrong. Here, Pedigo threatened harm to Bush's brothers if she said anything about his actions.

¶ 28 "[T]he issue of intent of sexual gratification in minors must be determined on a case-by-case basis." *In re Matthew K.*, 355 Ill. App. 3d at 656-57. There is "no bright-line test." *Id*. at 657. The trier of fact must consider all of the evidence before deciding whether intent can be inferred. *Id.* In the present case, viewing all of the evidence presented at the hearing, we conclude that a factfinder could rationally find by a preponderance of the evidence that Pedigo engaged in sexual conduct against Bush for the purpose of Bush's sexual gratification. Therefore, the evidence presented at the hearing sufficiently supported the circuit court's issuance of a plenary civil no contact order, and we must affirm.

¶ 29                                    CONCLUSION

¶ 30 For the foregoing reasons, we affirm the circuit court's judgment.


¶ 31 Affirmed.